# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWNEE TABERNACLE CHURCH | : | |
| and AZ LEARNING DAY CARE | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 16-5728 |
| | : | |
| GUIDEONE INSURANCE, | : | |
| Defendant. | : | |

**McHUGH, J.**  April 23, 2019

**MEMORANDUM**

This case is an action alleging bad faith on the part of an insurance company that delayed payment of a substantial claim for water damage for over a year. Plaintiffs have moved for summary judgment, essentially seeking a decision of the entire case in their favor. Because a plaintiff has the burden of proof, affirmative motions for summary judgment are rarely granted. *See Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990) (Posner, J.). I would overreach if I were to decide the entire case as a matter of law. With respect to a period between mid-June and mid-December, however, the facts are undisputed. During that time, I conclude that Defendant GuideOne acted in bad faith as a matter of law by ignoring the claim and withholding coverage when it possessed all of the necessary information to determine coverage. But as to the delays before and after this period of time, there are factual disputes and issues of causation. Accordingly, I will grant Plaintiffs' motion in part and deny it in part.

**I.      Factual Background**

This case centers on a loss that resulted from water damage on the property of Plaintiffs Shawnee Tabernacle Church and AZ Learning Daycare. The property in question was covered by an insurance policy that Defendant GuideOne Mutual Insurance Company ("GuideOne") issued. *See* Pls.' Compl. Ex. A, ECF No. 1, 1-1. The policy's provisions spelled out the obligations of the insurance company and the insured in the event of a loss. Of particular relevance to this case, a vacancy provision precluded water damage coverage if less than 31% of the building was rented or used for customary operations, unless the property was under construction or renovation. *Id.* at 72-73, ECF No. 1.

The loss in this case occurred on January 13, 2015, and on the same day, Plaintiffs reported the claim to GuideOne. GuideOne assigned adjuster Brian Baskin. Baskin received an initial report, spoke with Pastor Bloom of Shawnee Tabernacle Church, and made a preliminary estimate of damages prior to inspecting the property.[1] Mr. Baskin inspected the property on January 15, 2015.

Many details about the inspection are disputed. The parties agree that, at some point during the inspection, Baskin indicated he believed the policy's vacancy provision may apply and that, on January 15, 2015, GuideOne sent a Reservation of Rights letter. Baskin claims his concern about the vacancy provision arose as soon as he saw the property. In his deposition, he stated he "didn't see any evidence that there was activity in the school side of the structure," and he knew a school that previously rented the building had vacated the property in October 2014.

---

[1] Specifically, Mr. Baskin made a note in the Damage Adjustment Report indicating the loss could amount to $250,000 to $500,000 in water mitigation and $2.5 million to $3 million in repairs. *See* Def.'s Resp. to Pls.' Mot. Summ. J. Ex. 7, at 84, 88-89, ECF No. 29-2 [hereinafter Baskin Dep.]. Baskin has repeatedly stated that he relied only on the initial verbal reports of January 13, 2015 in arriving at this estimate. *Id.* at 90-91, 93-94, 97, 99. Baskin has also stated he made the note on January 13, although the document in question is dated June 17, 2015. *Id.* at 86, 90-91, 97-98.

Baskin Dep. 37-38. Although in the same deposition he admitted to seeing some renovation work during the inspection, he claimed it was limited to "one room in the back top second level" and maintained that he "did not see that to be renovations of the building." *Id.* at 76.

Plaintiffs allege that the concern about the policy's vacancy provision was merely a pretext to delay payment. They claim that Baskin cited the policy's vacancy provision only after first offering different reasons for reserving GuideOne's rights, reasons that were then contradicted by the statements of an engineer hired by GuideOne's subrogation department. Plaintiffs further argue that invoking vacancy as the basis for a denial of coverage was disingenuous because GuideOne and Baskin knew the provision did not apply. Specifically, Plaintiffs contend GuideOne knew that at the time of the loss the church was in the process of fixing damage the previous school tenants had caused, making the renovation exception to the vacancy provision applicable.[2] Additionally, the GuideOne claim log notes indicate that, immediately after the inspection, Baskin received information and documentation about the church and daycare's continued use of the property in November and December 2014. Def.'s Resp. to Pls.' Mot. Summ. J. Ex. 3, at 26-28, ECF No. 29-1 [hereinafter Claim Log]. Baskin nonetheless continued to investigate the vacancy question, which provided the basis to refrain from making payments for the losses Plaintiffs incurred. *See id.* at 24-26.

During that same timeframe, GuideOne became aware of serious economic pressure impacting its insured. First, from the date of the inspection, GuideOne knew that a tenant occupying the school portion of the building had left in the fall of 2014,[3] ahead of its July 31,

---

[2] Plaintiffs claim GuideOne's engineers photographed that damage, but they have not provided evidence establishing that fact. Pls.' Mot. Summ. J. 5, ECF No. 25.

[3] The precise date on which the school vacated is unclear, but the evidence indicates that the school kept property in the building until October 2014. *See* Claim Log 14, 27-28; Baskin Dep. 38.

3

2016 lease termination date.  *See* Def.'s Resp. to Pls.' Mot. Summ. J. Ex. 4, at 2, ECF No. 29-1.

Not long after, GuideOne also learned that a notice of foreclosure had been published in December 2014.  Claim Log 25.  When Mr. Baskin was deposed, he acknowledged that he was aware the church would suffer a loss of income during the period of time the building was unusable, Baskin Dep. 69-70, he had received bills for repairs to the property as of June 2015, *id.* at 125-126, he knew the building could not be rented if the damage were not repaired, *id.* at 123, and he also knew the Church was taking steps to look for a tenant.  *Id.* at 111.

Between March 4, 2015 and April 14, 2015, Plaintiffs' attorney, Marshall Anders, and Baskin exchanged multiple letters and phone calls.  As part of the coverage investigation, Baskin requested and Anders provided information regarding the use of the property.  In one letter, Anders also expressed interest in resolving the claim with a settlement and sought disclosure of GuideOne's assessment of the loss.[4]  Pls.' Compl. Ex. B, ECF No. 1-1.  In an April 14 letter, Baskin replied that GuideOne had instructed the consulting engineer it sent to the property to hold his report until after the coverage concerns were resolved.  He further advised Anders that settlement discussions would not proceed until after the completion of the coverage investigation.  Pls.' Compl, Ex. D, ECF No. 1-1.

This April 14 letter constituted Baskin's final communication with Plaintiffs.  *See* Claim Log 20-21; Baskin Dep. 107.  GuideOne's communication obligations were explicitly identified in the policy at issue here, which incorporated Title 31, Pennsylvania Code, Section 146.7(c)(1).  That provision states that, if an investigation cannot be completed within 30 days of the initial

---

[4] The letter regarding settlement referred specifically to a damages estimate between $1.8 million and $2 million.  Plaintiffs claim that on February 2, 2015, investigator John Femia informed church officials that GuideOne estimated the damages to be $1.8 million.  GuideOne has admitted that Baskin hired John Femia of G4S Compliance and Investigation and that Mr. Femia spoke with Pastor Bloom on February 2, 2015.  Def.'s Answer 3, ECF No. 8.  But GuideOne disputes the existence of any $1.8 million estimate, *id.* at 4, 5, and Baskin likewise contends that he has no recollection of such an estimate.  Baskin Dep. 93.

notification that more time is necessary, the insurance carrier must communicate to the insured, in writing, the reasons for the additional delay and when a decision on the claim may be expected. The carrier must continue such reporting every 45 days until the claim is resolved. Yet after April 14, Baskin sent no status letters to the insured as required by the policy and Pennsylvania law. Claim Log 20-21; Baskin Dep. 107. Baskin's successor appears to have discussed the coverage issue with Anders by phone, but also failed to comply with the policy and Pennsylvania law. *See* Claim Log 18.

Adjuster Baskin's next step in the coverage investigation was to arrange for examinations under oath (EUOs),[5] which the policy allowed for "at such times as may be reasonably required." Pls.' Compl. Ex. A, at 71, ECF No. 1. On April 23, 2015, Baskin made a claim log note about potential examinations, and on May 28, GuideOne's attorney, Dale Delaney, sent letters to schedule the EUOs. Claim Log 21; Pls.' Compl. Ex. E, ECF No. 1-1. The EUOs occurred on June 12, 2015. On June 15, Baskin made a claim log note that GuideOne's counsel had informed him the EUOs were complete, and on June 16, he wrote, "Okay to set precautionary reserve [redacted] awaiting review of EUO's and decision of coverage." Claim Log 20. The claim log contains no subsequent notes of activity in June, and no notes at all from July or August 2015.

In mid-July 2015, Baskin's supervisor, Mike Ellison, specifically instructed him to resolve the case with a compromise settlement. Baskin Dep. 120-21, 122; Ellison Dep. 28. Rather than comply with this instruction, however, Baskin waited two more months before reviewing the EUOs.[6] A claim log note reporting his review of the EUOs on September 13,

---

[5] GuideOne points out that Plaintiffs periodically refer to the EUOs as "depositions." To the extent that the parties dispute whether EUOs or depositions took place, that distinction is not material.

[6] In his deposition, Baskin suggested that he may have also reviewed the EUOs to some extent before speaking with Ellison in mid-July. Specifically, Baskin indicated that, in the July conversation, he expressed concerns about the questions asked in the EUOs. Baskin Dep. 117-20. But there is no note in the claim log referring to either a review of the EUOs in July or the conversation with Ellison. Ellison confirmed the mid-July conversation but did not speak

5

2015 is the only note Baskin made after June 16, 2015. Claim Log 20. At that time, he discussed the EUOs with Ellison, and informed Ellison that he had not resolved the case with a compromise settlement. Ellison again instructed Baskin to do so and told him he should have done better. Baskin Dep. 122; Ellison Dep. 28-30. During this time, it is undisputed that Baskin also failed to send the status letters required by Pennsylvania law to notify the insured of the reasons for the delay. Baskin Dep. 56, 59-60. On October 5, 2015, the claim was reassigned to a new adjuster, Larry Brown, to be handled on the merits. Claim Log 20.

Once Mr. Brown was assigned as the adjuster, he resumed contact with Plaintiffs' attorney, Marshall Anders, although he did not resume sending the required status letters. Between October 13 and November 30, 2015, Brown and Anders communicated regarding possible settlement. Anders provided Brown with documentation related to damages and requested copies of GuideOne's estimates regarding damages as well. As set forth above, Mr. Baskin had taken the position that GuideOne would neither obtain a damage estimate nor share what information it possessed concerning assessment of the loss until after coverage was established. *See* Pls.' Compl, Ex. D, ECF No. 1-1; Baskin Dep. 51, 53-54, 99-100, 121-22, 168-69. Mr. Brown did not alter that position and did not supply any loss assessment information in response to Shawnee's counsel's request.[7] In practical terms, GuideOne further delayed progress toward resolution of the claim by seeking to negotiate without first having to concede it was obligated under the terms of the policy to cover the loss.

---

to whether the EUOs had been reviewed. Ellison Dep. 28, 57-58. Significantly, however, if in fact Mr. Baskin reviewed the EUOs and had concerns about the adequacy of the exam conducted by GuideOne's counsel, he took no steps to address those concerns or gather further evidence pertinent to the vacancy exclusion.

[7] As GuideOne points out, Brown did finally have an estimate prepared in January, another month after coverage was established. *See* Def.'s Resp. to Pls.' Mot. Summ. J. 4; Claim Log 15.

On December 11, 2015—11 months after the initial water damage and 6 months after the EUOs were completed—GuideOne conceded that the claim was covered. After reviewing the file and investigation, Brown and his supervisor determined that the 31% use standard was satisfied, and coverage applied. Claim Log 18. In the six months preceding that coverage decision, GuideOne had sought no further information pertinent to whether coverage existed. From mid-June through mid-October, the file was simply ignored. From mid-October through mid-December, the newly assigned adjuster requested and received information pertaining to damages but did not require any new information to determine the existence of coverage. Stated differently, the information in GuideOne's file when it acknowledged coverage as of December 11, 2015 was exactly the same as it had on June 16, 2015, after the examinations under oath had been completed.

In December 2015, Plaintiffs' new (and current) counsel, William Fedullo, initiated contact with GuideOne. Like Anders, Fedullo sought information about GuideOne's evaluations as to damages. He also noted that the 11-month delay had caused significant losses beyond the damage to the structure. Pls.' Compl. Ex. I, ECF No. 1-1. Between December 2015 and at least August 2016, it appears that the parties engaged in repeated, yet unsuccessful, attempts to resolve this claim. Plaintiffs initiated this suit in November 2016. Many of the facts related to these efforts, such as what was provided and what the discussions entailed, remain disputed.

In addition to the evidence discussed above, Plaintiffs further support their motion with an expert report from James Haggerty, an attorney who has advised insurance carriers on claims-handling practices. GuideOne has not submitted any expert report in rebuttal.

## II. Legal Standard

Plaintiffs' Motion is governed by the well-established standards of Fed. R. Civ. P. 56, as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986). I must construe the record evidence in the light most favorable to the non-moving party. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 n.8 (3d Cir. 2009). In cases that turn on credibility determinations, summary judgment is inappropriate. *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144 (3d Cir. 1993).

## III. Discussion

Plaintiffs ask that I decide both breach of contract and bad faith as a matter of law—a considerable demand given the summary judgment standard. With respect to breach of contract, GuideOne agrees that it is obligated to provide coverage. Its disagreement is with the scope and amount of the loss, issues as to which there are multiple factual disputes. With respect to bad faith, although the ultimate issue requires resolution by a jury, as noted above, there are no factual disputes as to one critical six-month period, and GuideOne's inactivity and delay during that time frame can only be described as bad faith.

The Pennsylvania Supreme Court has formally adopted the *Terletsky* rule, holding: "to recover in a bad faith action, the plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017) (citing *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680 (Pa. 1994)). The clear and convincing evidence standard for bad faith claims "requires evidence clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy of the truth of the precise facts in issue." *Berg v.*

*Nationwide Mutual Ins. Co., Inc.*, 189 A.3d 1030, 1037 (Pa. Super. Ct. 2018) (quoting *Grossi v. Travelers Pers. Ins. Co.*, 79 A.3d 1141, 1165 (Pa. Super. Ct. 2013)), *appeal granted in part by* 2019 WL 1417141 (Pa. 2019).

The required analysis is inherently fact specific and centers on the conduct of the insurer in relation to the insured. *Berg*, 189 A.3d at 1037 (quoting *Condio*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006)). For that reason, it would go too far to decide all of the claims as a matter of law, because many of the allegations turn on disputed facts and the credibility of the individuals involved. But during that period of time where the facts are undisputed, the sole question is how GuideOne's actions are properly characterized. As a matter of law, I find that GuideOne acted in bad faith when it abandoned the investigation and resolution of Plaintiffs' claim between June 16, 2015 and October 5, 2015, and then further delayed a determination of coverage until December 11, 2015, despite the fact that it possessed all relevant information about the vacancy provision once the EUOs were complete.

The undisputed facts show that work on the claim was virtually nonexistent after June 16, 2015.[8] On June 16, Baskin made a note in the claim log stating that a precautionary reserve could be set and that review of the EUOs and a decision regarding coverage were pending. Claim Log 20. There is no evidence of Baskin working on the claim in late June, July, or August.[9] He made no notes in the claim log during that period. *Id.* Even GuideOne does not claim that Baskin worked on the claim during that time. *See* Def.'s Resp. to Pls.' Mot. Summ. J. 13. It is further undisputed that Baskin's only subsequent effort to further investigate the

---

[8] After June 16, GuideOne also failed to send the requisite status letters every 45 days to explain the delay or to otherwise communicate with Plaintiffs. Claim Log 19-20; Baskin Dep. 59-60. I address the implications of this lack of communication further below.

[9] The possible exception is the mid-July conversation with Ellison, in which Baskin was told to pursue settlement of the claim, along with any review of the EUOs that Baskin may have engaged in before that conversation. *See* Baskin Dep. 119-20. Although whether this can fairly be considered "working" on the claim is questionable.

claim—by finally reviewing the EUOs in September—occurred after he had been expressly instructed to resolve the claim. *See* Claim Log 20. In July, Baskin's supervisor, Mike Ellison, specifically directed him to resolve the case with a compromise settlement. Baskin Dep. 120-21. Instead of doing so, Baskin waited two months and then reviewed the EUOs in mid-September, at which point he was *again* instructed to resolve the claim. *Id.* at 122; Claim Log 20. Baskin's actions after the July conversation with Ellison constituted not only an inappropriate delay but defiance of explicit orders to resolve the claim. The record reveals no additional work on the claim until October 5, 2015, when it was reassigned to a new adjuster. Claim Log 20.

The new adjuster did not ignore the file in the same way but still failed to address the existence of coverage, even though GuideOne's investigation was effectively completed as of mid-June and despite the fact that his first instruction with respect to the claim was a note to "[h]andle on merits." *See* Claim Log 20. He corresponded with Plaintiffs' counsel to discuss potential settlement, but it was not until December 11 that GuideOne finally communicated that coverage existed. As noted above, during this interval, Defendant needed no additional information relevant to coverage and required no consultation with counsel to complete its review. The decision to confirm coverage simply required a review of the material already in GuideOne's file.

Given that these material facts from June 16 through December 11, 2015 are undisputed, I turn now to whether, as a matter of law, they establish that Defendant GuideOne acted in bad faith. I find that they do. In conducting this analysis, it is important to recognize that this lapse occurred well into the claims process—a full five months after the loss was reported. It is equally important to recognize that the loss was not a minor one, and the carrier knew of the economic duress facing its insured, including a pending foreclosure. With respect to this period

of approximately six months, there is clear and convincing evidence that GuideOne (1) did not have a reasonable basis for not acknowledging coverage under the policy and (2) knew of or recklessly disregarded the absence of that basis. *See Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017).

With respect to the first prong, even GuideOne does not argue that there is a reasonable basis for the failure to address the claim during this period. Although GuideOne offers the vacancy provision as a basis for the coverage investigation and resulting delay, the insurer gives no explanation for the failure to act on the claim between June and October or for the subsequent failure to acknowledge coverage until December. GuideOne points out that Baskin was moved to a new team in July and did not work on the claim due to his other responsibilities. Def.'s Resp. to Pls.' Mot. Summ. J. 13; Baskin Dep. 130. I find this excuse for GuideOne's actions inadequate because an insurance provider's obligation to its insured is entirely separate from how it chooses to manage its workforce. GuideOne's decision to alter Baskin's workload did nothing to negate its duty as an insurer to Plaintiffs. In fact, Baskin and Ellison both concede that the claim should have been resolved in July. Baskin Dep. 121; Ellison Dep. 28-29. After careful review of the record, I can identify no reasonable basis for the failure to acknowledge coverage and further assess the loss between June 16, 2015 and October 5, 2015.

A reasonable basis is similarly lacking with respect to the failure to acknowledge coverage between October 5, 2015, when a new adjuster was assigned, and December 11, 2015. When the new adjuster was assigned, it is unclear whether GuideOne communicated any sense of urgency. But a simple review of the file would have revealed the length of time the claim had been pending, the existence of EUOs addressing the vacancy issue, the total lack of activity from mid-June on, the pendency of foreclosure proceedings against the insured, and the failure to send

11

notices in compliance with the terms of the policy and the Pennsylvania Code dating back to April. Even if, from an individual perspective, some slight delay on the part of the new adjuster were reasonable, as the carrier, GuideOne had an obligation toward its insured and bore responsibility for the handling of the claim as a whole. GuideOne had no reasonable basis, given its possession as of June of all the information necessary to reach a coverage decision, for the further delay into mid-December.[10]

On the second prong, I am persuaded that GuideOne knew of or recklessly disregarded that lack of reasonable basis. *See Rancosky*, 170 A.3d at 365. In June, Baskin knew the claim was ready for review of the EUOs and a coverage decision. He admitted as much when he made a note on June 16 about the need to review the EUOs and determine coverage. In mid-July, Baskin knew there was no reason not to resolve the claim with a compromise settlement because his supervisor had instructed him to resolve it. After that conversation, Baskin not only knew there was no basis for further delay in the coverage investigation, he knew there was no basis for delay in negotiating or settling the claim itself. Despite this knowledge, Baskin allowed the claim to languish until October, and although his successor ultimately addressed the claim, he delayed an additional two months before confirming coverage. I find this evidence "clear, direct, weighty, and convincing" so as to permit "a clear conviction, without hesitancy of the truth of the precise facts in issue," that Defendant acted recklessly.[11] *See Berg*, 189 A.3d at 1037. Indeed, I see no evidence in the record to support the opposite judgment.

---

[10] In fairness, it should be noted that the record does not establish precisely when Mr. Baskin received the transcripts of the EUOs, or the content of the oral briefing he received from counsel on June 15. *See* Claim Log 20; Baskin Dep. 58. But once those examinations were conducted, GuideOne's counsel had actual knowledge of the facts relevant to coverage, information readily available to GuideOne and Baskin through a variety of means.

[11] Plaintiffs' expert report supports this conclusion. What is most telling is not so much the opinions the report sets forth, but the fact that GuideOne has offered no rebuttal report.

Proof of ill-will or self-interest is not required to show that an insurer knew of or recklessly disregarded the absence of a reasonable basis to deny or delay benefits. *Rancosky*, 170 A.3d at 365. Rather, bad faith may include "lack of good faith investigation into fact[s], and failure to communicate with the claimant," both of which certainly occurred in this case between June and December. *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004). Similarly, a delay in investigation of a claim may constitute bad faith where it involves [i]nexcusable periods of inactivity, unreasonable assumptions, and inadequate communication." *Grossi*, 79 A.3d at 1154. Here, GuideOne has offered no excuse for the inactivity with respect to coverage between June 16 and December 11, and it engaged in little to no communication with Plaintiffs about the coverage issue during the same period.[12]

The lack of communication is a violation of Section 146.7(c)(1) of Title 31 of the Pennsylvania Code, which requires a report to the insured every 45 days explaining the reasons for delay in resolving a claim. Although such a violation does not establish bad faith *per se*, it constitutes relevant evidence. *Berg v. Nationwide Mut. Ins. Co., Inc.*, 44 A.3d 1164, 1174 (Pa. Super. Ct. 2012); *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1230 (Pa. Super. Ct. 1994). But Section 146.7(c)(1) has relevance beyond the obligation to communicate. By specifying the frequency with which a carrier must report to its insured, it provides an objective yardstick recognized by the Pennsylvania Insurance Department as to what constitutes a reasonable interval within which a carrier should be able to address the merits of a claim. From mid-June through mid-December, four full intervals elapsed without resolution or explanation,

---

[12] There is evidence that, once in November, Larry Brown discussed the pending coverage issue with Marshall Anders by phone. But Brown still ignored the formal reporting requirements of the policy and the Pennsylvania Code. *See* Claim Log 18.

13

even as Shawnee faced financial peril.  This further supports the conclusion that GuideOne's conduct was reckless during this period and constituted bad faith.

Defendant GuideOne argues that "[t]o the extent there was a short delay between June and October in Mr. Baskin's handling of the file, any delay attributable to Mr. Baskin could easily be found to be a mistake or mere negligence by a finder of fact."  Def.'s Resp. to Pls.' Mot. Summ. J. 13.  I disagree.  Although mere negligence does not constitute bad faith, the circumstances described above cannot reasonably be viewed as mere negligence.  *See Grossi*, 79 A.3d at 1148-49; *see also Rancosky*, 170 A.3d at 374.  Baskin did not mistakenly think the delay was appropriate or neglect part of his responsibilities with respect to the claim.  He stopped working on it altogether, despite knowing what needed to be done, and then defied his supervisor's instructions to resolve the claim.  Even after Baskin was removed from the claim, GuideOne then delayed two additional months before establishing coverage—a delay that can only be viewed as reckless given the age of the claim by that point, the jeopardy faced by the insured, and the company's possession of all the information needed to resolve the coverage question.  In deeming this inactivity reckless, rather than negligent, I return to the specific posture of the claim.  When Baskin halted forward progress on the claim, it had already been pending for five months, with an insured that was dependent on rental income to support the property, unable to rent it until the claim was resolved, and facing foreclosure proceedings.  GuideOne then permitted an additional six months to elapse, despite possessing of all the information it deemed necessary to decide the issue of coverage.

With respect to that six-month period, I conclude as a matter of law that GuideOne acted in bad faith in the abandonment of the claim from June 16 through October 5, and in failing to

make a coverage decision between October 5 and December 11, 2015. The jury will be instructed accordingly.[13]

I will therefore grant in part and deny in part Plaintiffs' Motion for Summary Judgment. An appropriate order follows.

                                                  /s/ Gerald Austin McHugh
                                                United States District Judge

---

[13] Nothing in this opinion prevents Plaintiffs from arguing bad faith before or after the time frame in which I have ruled as a matter of law, and nothing prevents GuideOne from raising any affirmative defense available to it. Plaintiffs continue to bear the burden of proving that the bad faith during this period or some other act of bad faith caused their damages.